IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

YVETTE MILLER,                    :
for J.W., a Minor,                :      CIVIL ACTION
                                  :      No. 14-06378
          Plaintiff,             :
                                  :
     v.                           :
                                  :
CAROLYN W. COLVIN,                :
                                  :
          Defendant.             :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          June 16, 2016


          Yvette Miller ("Plaintiff"), on behalf of minor
plaintiff J.W., brought this action pursuant to 42 U.S.C.
§ 405(g), seeking judicial review of the decision by Carolyn W.
Colvin ("Commissioner" or "Defendant") – acting Commissioner of
the Social Security Administration ("SSA") – denying J.W.'s
application for Supplemental Security Income ("SSI"). Upon
consideration of the administrative record, submitted pleadings,
Magistrate Judge Timothy R. Rice's Report and Recommendation
("R&R"), and Plaintiff's Objections thereto, the Court will
overrule Plaintiff's Objections, adopt the R&R, and grant
judgment to the Commissioner.

1

I.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

In November 2010, Plaintiff sought SSI on behalf of her daughter, J.W., alleging disability. R. 15. The claim was initially denied, and Plaintiff filed a written request for a hearing, which was granted. R. 15.

At the time of the hearing with the Administrative Law Judge ("ALJ"), J.W. was ten years old, 4 feet 3 inches tall,[2] and 110 pounds. R. 34, 142. She lived with her two sisters and Plaintiff. R. 47. J.W.'s father is incarcerated, and J.W. has had several family members die, including her aunt, her uncle who was murdered, her great-grandfather, and her grandmother's husband. R. 44, 47.

During the administrative hearing, J.W. did not respond to the ALJ's questions. She simply stated, "I don't want to talk." R. 41. Therefore, Plaintiff testified on J.W.'s behalf. See R. 34. Plaintiff stated that although J.W. is in the fifth grade, she performs at a third-grade level. R. 34. Plaintiff also stated that J.W. had been home-schooled for the preceding year because she was unable to interact with peers in a classroom. R. 35. Plaintiff reported that J.W. needs

---

[1]     Citations to "R." are citations to the administrative record, which is located on the docket at ECF number 9.

[2]     J.W.'s medical records indicate that J.W. was measured at around 4 feet 3 inches tall, R. 235, whereas Plaintiff reported on "Form SSA-3820" that J.W. is 3 feet 4 inches tall, R. 142. Plaintiff's report appears to be a transposition error.

assistance bathing, washing, dressing, and grooming. R. 136. J.W. does not help around the house, obey, or accept criticism. R. 136. She has issues with comprehension and attention, and she has gotten into fights at school. R. 38-39. J.W. suffers from depression, cries, experiences angry outbursts, hallucinates, and engages in self harm. R. 37-38. Plaintiff also testified that J.W. has problems communicating and is more depressed than functional. R. 40.

After the hearing, the ALJ applied the three-step analysis laid out in 20 C.F.R. § 416.924 and denied benefits to J.W., finding that J.W. is not disabled for purposes of the Social Security Act. R. 15-26. The Appeals Council denied J.W.'s request for review. R. 1-3.

Plaintiff commenced the present action in November 2014, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). ECF No. 3. On August 27, 2015, Magistrate Judge Timothy R. Rice issued a Report and Recommendation, recommending that Plaintiff's request for review be denied and judgment be entered in the Commissioner's favor. ECF No. 14. Plaintiff filed an Objection, ECF No. 15, to which the Commissioner responded, ECF No. 17. Plaintiff then filed a reply, ECF No. 18, and the matter is now ripe for disposition.

## II.   STANDARD OF REVIEW

The Court undertakes a de novo review of the portions of the R&R to which Plaintiff has objected. See 28 U.S.C. § 636(b)(1); Cont'l Cas. Co. v. Dominick D'Andrea, Inc., 150 F.3d 245, 250 (3d Cir. 1998). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

In reviewing the Commissioner's final determination that a person is not disabled and, therefore, not entitled to Social Security benefits, the Court may not independently weigh the evidence or substitute its own conclusions for those reached by the ALJ. See Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). Instead, the Court must review the factual findings presented to determine whether they are supported by substantial evidence. See 42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).

Substantial evidence constitutes that which a "reasonable mind might accept as adequate to support a conclusion." Rutherford, 399 F.3d at 552. "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" Id. (quoting Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971)). If the ALJ's decision is supported by substantial evidence, the Court may not set it aside even if the Court would have decided the factual inquiry differently.

4

See Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); see also Rutherford, 399 F.3d at 552 ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (alteration in original) (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992))).

**III.     THE ALJ'S DECISION**

An ALJ uses a three-part analysis to determine whether a child is disabled for the purpose of receiving Social Security benefits. See Valez ex rel. J.M.A. v. Astrue, No. 10-2681, 2011 WL 1248707, at *1 (E.D. Pa. Feb. 4, 2011), report and recommendation adopted, 2011 WL 1235596 (E.D. Pa. Apr. 4, 2011). First, the ALJ considers whether the child is working. See 20 C.F.R. § 416.924(b). Second, the ALJ considers whether the child has a medically determinable severe impairment or combination of impairments. See id. § 416.924(c). Third, the ALJ considers whether the child's impairments "meet, medically equal, or functionally equal [those impairments in] the listings." See id. § 416.924(d).

Here, the ALJ determined that J.W. is not disabled. At step one, the ALJ found that J.W. was not engaged in substantial gainful activity. R. 18. At step two, the ALJ found that J.W. had a "severe" impairment of a mood disorder. Id. At step three, the ALJ found that J.W.'s mood disorder did not meet or

medically equal one of the listed impairments. Id. The ALJ also determined that J.W.'s condition did not functionally equal the severity of the listings because she had a less than marked limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself, as well as no limitations in the domains of moving about, manipulating objects, and health and physical well-being. R. 21-26. The ALJ thus determined that J.W. is not entitled to benefits. R. 15.

## IV.   DISCUSSION

Judge Rice recommends that Plaintiff's request for review be denied and judgment entered for the Commissioner. R&R 19. Plaintiff objects to the recommendation, arguing that Judge Rice erred by (1) finding that the ALJ adequately explained his determination that J.W.'s mood disorder does not satisfy the listing requirements; (2) finding that the ALJ was not required to consider certain instances of J.W.'s self-injurious behavior; (3) finding that substantial evidence supported the ALJ's determination that J.W. has a less than marked impairment in the domain of interacting and relating with others; (4) finding that substantial evidence supported the ALJ's determination that J.W. has a less than marked impairment in the domain of self-care; (5) finding that the ALJ did not err in failing to mention two

GAF scores; (6) finding that the ALJ did not fail to consider J.W.'s capacity to function outside of a highly structured setting; (7) finding that the ALJ was not required to discuss J.W.'s obesity; and (8) finding that remand for consideration of J.W.'s Individualized Education Program ("IEP"), which was completed two months after the ALJ's decision, is not required. Each objection is discussed in turn.

A.   Listing Requirements

Plaintiff argues that the ALJ failed to sufficiently explain why J.W.'s mood disorder does not medically equal the severity of a listed impairment. Objs. 1-2. When a child does not have a listed impairment, the ALJ must determine whether the child has an impairment or combination of impairments that (1) medically or (2) functionally equals the severity of a listed impairment.[3] 20 C.F.R. §§ 416.924(d), 416.926a, 416.929.

For a child's mood disorder to medically equal a listed impairment, a child must have an impairment or combination of impairments that is similar to the requirements described in any listing. Id. § 416.924(d). For an impairment to be functionally equal to a listed impairment, a child must show

---

[3]      A "listed impairment" is one that appears on the Commissioner's "Listing of Impairments," located at 20 C.F.R. pt. 404, subpt. P, app. 1, which enumerates several "impairments presumed severe enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. 521, 525 (1990).

"marked" limitations in two domains of functioning or "extreme" limitation in one domain. Id. § 416.926(a). The six development and functioning domains include: acquiring and using information; attending to and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. Id. § 416.926a(b)(1)(i)—(vi).

Here, the ALJ determined that J.W.'s mood disorder does not meet, medically equal, or functionally equal the severity of one of the listed impairments. R. 18. The ALJ explained that "although the medical evidence documents persistent complaints and some observations of a depressed or irritable mood, decreased appetite, sleep disturbance, suicidal thoughts, and hallucinations," the record "does not support marked limitations of at least two of [the Part B categories]." R. 18.

Plaintiff first claims that the ALJ erroneously relied upon section 12.04, which lists the Part B criteria for adults, rather than section 112.04, which lists the Part B criteria for children. Objs. 2. It is true that the ALJ stated that "the claimant's mood disorder does not satisfy listing 12.04." R. 18 (emphasis added). But remand is not required, because it is clear that the ALJ's citation to section 12.04 was a mere

typographical error and that he had in fact relied on section 112.04.

The ALJ stated that "the medical evidence discussed below does not support marked limitations of at least two of the following: age-appropriate cognitive/communicative functioning; age appropriate social functioning; age appropriate personal functioning; or maintaining concentration, persistence, or pace." R. 18. These categories are taken verbatim from the section 112.04 Part B criteria applicable to children. See 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.04A. Therefore, the ALJ's scrivener's error in citing to section 12.04 rather than section 112.04 does not warrant remand.

Plaintiff next argues that Judge Rice and the ALJ failed to consider J.W.'s everyday functioning as compared with other children of the same age who do not have impairments when determining whether her mood disorder meets or equals a listed impairment. Objs. 4-5. Policy interpretation rulings state that children age six and older usually attend school, SSR 09-2p, 2009 WL 396032 (Feb. 18, 2009), and the functional equivalence assessment is to consider "how the child functions every day and in all settings compared to other children the same age who do not have impairments," SSR 09-1p, 2009 WL 396031 (Feb. 17, 2009).

9

Here, after listing the skills and characteristics that a school-aged child without an impairment should display, the ALJ considered J.W.'s everyday functioning, as demonstrated by Plaintiff's testimony; J.W.'s school records; a report from Dr. Schwartz, a psychologist who provided a consultative examination; and a report from Ms. Diana Polizzi-Ilisio, J.W.'s teacher. R. 22. This evidence shows that J.W. completed homework under supervision, worked independently, showed focus, and appeared to be goal oriented, but often took longer to complete work accurately without mistakes. Id. Considering this evidence on the whole, the ALJ found "a less than marked limitation in this functional domain based on treatment observations of the claimant as attentive and school records of generally no greater than slight limitations in attending and completing tasks." Id. Therefore, because the ALJ properly considered J.W.'s everyday functioning compared to other children of the same age who do not have impairments, and because substantial evidence supports the ALJ's finding, the Court will overrule this objection.

   B.   Ability to Care for Self

Plaintiff also contends that the ALJ erred in finding that J.W. has a less than marked limitation in ability to care for herself. Objs. 3-5. Plaintiff argues that the ALJ failed to discuss certain instances in which J.W. engaged in self-harm-- namely, a time that she attempted to jump from a seventeenth

story balcony and another time that she swallowed a bottle of Ambisol medication. Id. at 3. Plaintiff also avers that "[i]f the ALJ did not find these instances probative, at a minimum the ALJ was required to explain his reasoning." Id. at 4.

In the domain of self-care, the ALJ considers how well the claimant can "maintain a healthy emotional and physical state"; how the claimant "cope[s] with stress and changes in [her] environment"; and whether the claimant "take[s] care of [her] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). The regulations provide that a claimant of J.W.'s age should act independently in conducting most day-to-day activities (e.g., dressing and bathing); recognize her own competency and difficulty in different activities; identify circumstances in which she feels good or bad about herself; begin to develop an understanding of right and wrong; begin to demonstrate consistent control over behavior; and know when behaviors are unsafe or otherwise not good for one's person. See id. § 416.926a(k)(2)(iv). Examples of limited functioning in this domain include not dressing or bathing appropriately; engaging in self-injurious behavior; not pursuing enjoyable activities or interests; and experiencing disturbances in sleeping or eating habits. See id. § 416.926a(k)(3).

Although the ALJ did not mention the Ambisol and balcony events by name, the ALJ discussed Albert Einstein

11

Healthcare Network records that specifically memorialized the
Ambisol event, and the ALJ recognized that those records
document J.W.'s self-injurious behaviors. R. 19 (citing Ex. 3F
("Office Treatment Records, dated 11/02/2010, from Albert
Einstein Medical Center")). The ALJ also discussed reports from
Dr. Yu and Dr. Kapoor, which specifically referenced the porch
incident. R. 20 (citing Exs. 8F, 9F); see R. 381, 383. Moreover,
the ALJ repeatedly referenced and considered reports of J.W.'s
past suicidal ideations and self-injurious behaviors. R. 18, 19,
20, 25.

          Plaintiff further argues that "J.W.'s need for home
schooling to address her mental health symptoms indicates that
she does not engage in many of the activities that other
children perform such as playing with classmates, responding to
teachers and caring for herself without the assistance of her
mother." Objs. 4. But the ALJ adequately considered J.W.'s home
schooling. The ALJ noted that J.W. "has been homeschooled since
September 2012 in part because teachers previously reported the
claimant's fights with peers." R. 24. The ALJ further noted that
Plaintiff "is better able to help [J.W.] cope with outbursts now
that she is homeschooled." R. 25.

          And, in any event, substantial evidence supports the
ALJ's finding that J.W. has "a less than marked limitation in
[the domain of self-care] based on persistent impulse control

problems and self-injury improved with more consistent mental health treatment and more intense supervision while homeschooled." R. 25. For example, Dr. Yu noted that J.W. does not engage in significant risk-taking behaviors and poses no immediate danger toward others. R. 353. Although J.W. was not sleeping well at times, R. 376, 389, she slept normally other times, R. 236. Reports indicate that J.W. pursued enjoyable activities and interests, such as playing with friends and going outside. R. 363. During her partial hospitalization, J.W. was cooperative; had normal speech and mood; displayed a congruent affect; engaged in linear thought processes; had no suicidal or homicidal ideations; reported no hallucinations; delusions, or signs of psychosis; displayed fair insight and judgment; and appeared cognitively intact. R. 342. Also, after admission to the Horsham Clinic in August 2012, J.W. denied having any suicidal ideation, intent, or plan, and denied having hallucinations. R. 384. Her cognitive exam at that time was grossly intact. R. 384. Dr. Schwartz further reported that although there is a need to monitor J.W.'s self-harm, J.W. is otherwise able to care for herself. R. 367. Thus, the ALJ's determination that J.W. has a less than marked limitation in the domain of self-care is supported by substantial evidence.

C.    Interacting and Relating with Others

Plaintiff next argues that substantial evidence does not support the ALJ's decision that J.W. has a less than marked limitation in interacting and relating with others. Objs. 4.

In analyzing this domain, the ALJ considers how well the claimant can "initiate and sustain emotional connections with others, develop and use the language of [his or her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations provide that a claimant of J.W.'s age should be able to develop more lasting friendships with like-aged children; begin understanding how to work in groups to create projects and solve problems; increasingly understand another's point of view and tolerate differences; and be able to talk to people of all ages, share ideas, tell stories, and speak in a manner that both familiar and unfamiliar listeners readily understand. Id. § 416.926a(i)(2)(iv). Examples of limited functioning in this domain include not having any close friends; withdrawing from people; being overly anxious or fearful of meeting new people; having difficulty playing games or sports; and having difficulty communicating or speaking intelligibly. Id. § 416.926a(i)(3).

Here, the ALJ considered J.W.'s school and treatment records; reports indicating that J.W. spoke with an imaginary

friend; J.W.'s initial difficulty interacting with two healthcare providers; J.W.'s ability to interact with other providers; and Plaintiff's report that J.W. displayed "behavioral problems at home albeit with better control." R. 24. The ALJ concluded that "this evidence supports a less than marked limitation" in the domain of interacting and relating with others. Id.

Substantial evidence supports the ALJ's finding. Plaintiff initially reported no limitation in this functional domain, stating that J.W. has friends her own age, can make new friends, generally gets along with adults, and plays team sports. R. 159. J.W.'s school records from September 2010 similarly state that J.W. cooperates well, handles conflict and redirection well, transitions easily, shows respect for authority figures, and works well in groups. R. 396. During J.W.'s partial hospitalization, her parents reported occasionally defiant behavior at home and slight academic problems at school, but did not report any behavioral problems at school. R. 341. The record includes reports of hallucinations, but at least one record acknowledged the possibility of exaggeration. See R. 316, 342. One of J.W.'s teacher reported no limitation in this domain, R. 172, and another teacher reported that J.W. respected authority figures and handled redirection well. R. 409. Although initially

15

uncooperative with her counselor, J.W. eventually became more open and cooperative. R. 426-39. Therefore, because the ALJ's finding that J.W. has a less than marked limitation in interacting and relating with others is supported by substantial evidence, the Court will overrule Plaintiff's objection on this basis.

   D.   Global Assessment Functioning Scores

      Plaintiff also argues that the ALJ erred in failing to discuss J.W.'s Global Assessment Functioning ("GAF") scores of 15 from November 2, 2010,[4] and 50 from October 19, 2012. Objs. 5-6 (citing R. 334, 440). Plaintiff further alleges that the ALJ improperly discounted the GAF score of 50 by Dr. Aledo. Id. at 6. According to Plaintiff, "[t]he decreasing GAF scores following discharge from partial hospitalization show that J.W. does not function as well outside of a structured setting," and "[i]f the ALJ had considered all of the GAF scores in the file he could have detected this pattern." Id.

      "A GAF score is a 'numerical summary of a clinician's judgment of [an] individual's overall level of functioning.'" Rivera v. Astrue, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014) (alteration in original) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th

_____

[4]      Plaintiff erroneously states that the GAF Score of 15 was reported on November 12, 2012. Compare Objs. 6, with R. 334.

ed. 2000) [hereinafter DSM-IV]). The GAF scale is "used by mental health professionals to 'assess current treatment needs and provide a prognosis.'" Colon v. Barnhart, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006) (quoting 65 Fed. Reg. 50,746, 50764-65 (Aug. 21, 2000)).

The Court recently discussed the applicability of GAF scores and the standard to be applied in the Social Security Disability context:

> In recent years . . . the GAF scale has "fallen somewhat into disfavor," as the American Psychiatric Association abandoned the GAF scale in the most recent edition of the DSM ("DSM-V"). Kroh v. Colvin, No. 13-1533, 2014 WL 4384675, at *17 (M.D. Pa. Sept. 4, 2014). As a result of the DSM-V, the SSA issued an Administrative Message ("AM") in July 2013, instructing ALJs "on how to consider Global Assessment of Functioning (GAF) ratings when assessing disability claims involving mental disorders." AM-13066 (July 22, 2013). Critically, the AM notes that even though the DSM-V eliminated the GAF scale, the SSA "will continue to receive and consider GAF in medical evidence." Id. Specifically, "a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file . . . ." Id. Accordingly, the Court looks to the general guidelines concerning the evaluation of opinion evidence to determine how GAF scores should be considered by an ALJ.
>
> Opinions from treating sources are generally given more weight than opinions from other sources. 20 C.F.R. § 416.927(c)(2). In fact, so long as a treating source's opinion is "well-supported" and "not inconsistent with the other substantial evidence," it is given "controlling weight." Id. Either way, an ALJ is to "give good reasons . . . for the weight" she gives to a treating source's opinion. Id. The AM reiterates this standard and specifically applies it

to GAF scores, instructing ALJs that "[w]hen case evidence includes a GAF from a treating source and you do not give it controlling weight, you must provide good reasons in the personalized disability explanation or decision notice." AM-13066. In short, an ALJ must "evaluate adequately all relevant evidence," including GAF scores, and "explain the basis of his conclusions." Fargnoli [v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001)].

This standard does not, as Plaintiff urges, create or imply a bright-line rule that a case must be remanded if the ALJ failed to address any GAF scores. There was no such rule before the DSM-V eliminated the GAF scale, see Packard v. Astrue, No. 11-7323, 2012 WL 4717890, at *2-3 (E.D. Pa. Oct. 4, 2012) (reviewing cases and summarizing the pre-DSM-V law on GAF scores), and there is still no such rule today. That is, a GAF score does not trigger any unique requirements for the ALJ to fulfill; the failure to invoke the number itself does not require remand. Rather, the question is whether the ALJ "conduct[ed] a thorough analysis of the medical evidence regarding plaintiff's mental impairments," Rivera v. Astrue, 9 F. Supp. 3d 495, 506-07 (E.D. Pa. 2014), such that the ALJ properly "addressed the issues on which plaintiff's GAF scores were based," Lee v. Colvin, No. 11-4641, 2014 WL 2586935, at *2 (E.D. Pa. June 10, 2014). In other words, even if the ALJ did not specifically mention an actual GAF number, she has provided "good reasons" for discounting the GAF score if she adequately explained why she discounted the whole of the source's opinion.

Nixon v. Colvin, No. 14-4322, 2016 WL 3181853, at *3 (June 7, 2016).

Here, the ALJ's failure to mention two GAF scores does not require remand. First, failure to discuss the score of 15 does not require remand, because consideration of the omitted score would not have been material to the ALJ's decision. See Bracciodieta-Nelson v. Comm'r of Soc. Sec., 782 F. Supp. 2d 152,

165 (W.D. Pa. 2011) ("An ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record."). The ALJ concluded that J.W.'s GAF scores had improved with treatment by 2012. R. 21. The GAF score of 15 was reported in November 2010. R. 334. Thereafter, J.W. received a score of 55[5] from Dr. Yu in January 2011; a score of 45[6] from Dr. Schwartz in February 2011; a score of 35[7] from Dr. Yu in August 2012; and a score of 60[8] from Dr. Kapoor in October 2012. R. 20. Therefore, even if the ALJ had specifically mentioned the GAF score of 15 from November

---

[5]     A GAF score in the 51 to 60 range indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

[6]     A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

[7]     A GAF score in the range of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

[8]     See supra n.5.

2010, it would not have affected the ALJ's conclusion that J.W.'s GAF score had improved with treatment by 2012. As such, remand is not required.

Likewise, the ALJ's failure to consider the GAF score of 50[9] from Ms. Smutzler in 2012 does not require remand. Remand is not required if the reporting source did not explain the basis for the given GAF score. See Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir. 2009) (nonprecedential) (remand not required where treating physician did not explain the basis for the GAF score). Here, Ms. Smutzler's GAF score for J.W. is listed as a "preliminary diagnosis" in Ms. Smutzler's "Initial Clinical Impression" and appears without any explanation. See R. 440.

Moreover, the ALJ otherwise addressed the issues raised in Ms. Smutzler's report containing the GAF score. R. 20 (citing 12F at 27-30), 26 (citing 12F at 28-29). Cf. Nixon, 2016 WL 3181853, at *4-5 (remanding case for consideration of GAF scores where "[t]he ALJ did not even reference the forms" containing the scores and did not give any other indication that she considered the opinions of the treating physicians). And the ALJ expressly indicated that he took into account Ms. Smutzler's opinion in its entirety. See R. 20 (citing Ex. 12F at 13-26, 27-

---

[9]        See supra n.6.

20

30), 21 (citing Exhibit 12F at 31), 22 (citing Exhibit 12F at
33), 23 (citing Exhibit 12F generally and Exhibit 12F at 32), 25
(citing Exhibit 12F at 34). Therefore, because the ALJ
"conduct[ed] a thorough analysis of the medical evidence
regarding [the] plaintiff's mental impairments," Rivera, 9 F.
Supp. 3d at 506-07, such that the ALJ properly "addressed the
issues on which [the] plaintiff's GAF scores were based," Lee,
2014 WL 2586935, at *2, remand is not required.

Finally, the ALJ did not err in affording little
weight to Dr. Aledo's GAF score of 50 from January 2013. "An ALJ
may reject a treating physician's opinion outright only on the
basis of contradictory medical evidence, but may afford a
treating physician's opinion more or less weight depending upon
the extent to which supporting explanations are provided."
Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing
Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)).

In this case, Dr. Aledo's report containing the GAF
score of 50 contradicts other medical evidence. In his report,
Dr. Aledo stated that J.W. had received a GAF score no greater
than 50 since January 2012. R. 422. Yet J.W. received a GAF
score of 60 in October 2012. R. 383. As such, the ALJ explained
that J.W.'s "GAF score of 60 in October 2012 contradicts Dr.
Aledo's report of a GAF score no greater than 50 since January
2012." R. 21.

21

Moreover, Dr. Aledo's GAF score is not entitled to significant weight, because it is unsupported. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). Dr. Aledo's GAF score for J.W. appeared on a form without explanation as to its basis. R. 422. Dr. Aledo noted only that 50 was the highest GAF score J.W. had received in the past 12 months, R. 422, which, as previously discussed, was inaccurate. See R. 383. Thus, because Dr. Aledo's GAF score was transcribed without explanation, the ALJ's decision to afford it little weight does not warrant remand.

E.     Functioning Outside of a Highly Structured Setting

Plaintiff next argues that the ALJ failed to consider J.W.'s capacity to function outside of a highly structured setting. Objs. 6-7. Judge Rice dismissed this argument because "[p]lacement in a structured setting in and of itself does not equate with a finding of disability." R&R 16 (citing 20 C.F.R. pt. 404, subpt. P., app. 1, § 112.00E). According to Plaintiff, "[t]he question is not just whether J.W. was placed in a structured setting but how she 'functions outside of highly structured settings.'" Objs. 6 (citing 20 C.F.R. pt. 404, subpt. P., app. 1, § 112.00E).

Section 416.924a(b)(5)(iv)(C) of the Social Security regulations provides that

A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting. Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting. Even if you are able to function adequately in the structured or supportive setting, we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting.

20 C.F.R. § 416.924a(b)(5)(iv)(C).

But "[t]he regulation does not command the ALJ to explicitly discuss his consideration of these factors in the decision." Turner v. Barnhart, No. 05-3509, 2006 WL 2460876, at *3 (E.D. Pa. Aug., 21, 2006).

Here, the ALJ properly assessed J.W.'s functional capacity both inside and outside of structured settings. He considered all of the medical, non-medical, and educational evidence addressing J.W.'s behavior while in public school and while homeschooled. R. 19, 23, 25, 35, 38-39. The ALJ concluded that J.W.'s symptoms outside of a highly structured setting significantly improved after partial hospitalization and with consistent therapy. R. 25. The ALJ noted that upon discharge for partial hospitalization, J.W. received GAF scores in the 60s, representing mild symptoms or limitations. R. 19. Also, the ALJ recognized that J.W. worked independently on school work but may need additional reinforcement to begin a task. R. 22.

23

Accordingly, the ALJ's decision adequately reflects the effect of J.W.'s environment - both in and out of a highly structured setting - on her symptoms.

Plaintiff argues that J.W.'s difficulty functioning outside of a structured setting is demonstrated by "the initial clinical impression of Ms. Smutzler after J.W.'s discharge from partial hospitalization indicating that J.W. has angry outbursts and no other friends other than her imaginary friend."[10] Objs. 7. But the ALJ gave Ms. Smutzler's opinion little weight and sufficiently explained his reasons for doing so.

As previously discussed, "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Here, Ms. Smutzler's report that J.W. had marked limitations in the domain of self-care after partial hospitalization conflicted with other evidence suggesting fewer symptoms and limitations after partial hospitalization with consistent therapy. Compare R. 447 (reporting difficulties in the domain of self-care), with R. 174 (reporting no problems in the domain of self-care), R. 383 (documenting increased GAF score after partial hospitalization), and R. 384-85 (describing

---

[10]     To the extent Plaintiff argues that "J.W.'s dropping GAF scores after discharge indicate that she does not function as well outside of a structured setting," Objs. 6, the ALJ's assessment of J.W.'s GAF scores is discussed supra.

progress made upon discharge). Moreover, Ms. Smutzler's report was not based on personal observation. Her report stated that "I have not conducted educational testing on [J.W.]," R. 444; "I have not directly observed [J.W.] in a classroom setting," R. 446; "[J.W.] has a history of taking things that don't belong to her, though I haven't observed this directly," R. 447. Therefore, the ALJ did not err in affording Ms. Smutzler's opinion little weight as to J.W.'s symptoms outside of a structured setting.

In sum, the ALJ considered J.W.'s symptoms while in public school and her symptoms while homeschooled. The ALJ also considered J.W.'s symptoms in a structured setting by recognizing that J.W.'s symptoms improved with partial hospitalization. And the ALJ addressed J.W.'s symptoms outside of a structured setting by recognizing that her symptoms continued to improve with outpatient therapy following her release. As such, the Court will overrule Plaintiff's objection.

F.    Failure to Discuss Obesity

Plaintiff next contends that the ALJ erred in failing to discuss J.W.'s obesity. Objs. 7-9. Judge Rice concluded that the ALJ was not required to discuss J.W.'s obesity, because J.W. did not identify obesity as an impairment. R&R 16-17 (citing R. 143, 181). But Plaintiff argues that the ALJ was put on notice of obesity as an impairment by the record's references to J.W.'s

25

weight, which, according to Plaintiff, showed that J.W.'s obesity negatively impacted her mental health. Objs. 9.

An ALJ must "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02-1p, 2002 WL 3468281 (Sept. 12, 2002). Generally, the clamant must identify obesity as an impairment or offer evidence as to its effect on performance. Rutherford, 399 F.3d at 552-53. But even if obesity is not listed, the ALJ must consider the effects of a claimant's obesity if "the references to [the claimant's] weight in his medical records were likely sufficient to alert the ALJ to the impairment." Eskridge v. Astrue, 569 F. Supp. 2d 424, 438 & n.24 (D. Del. 2008).

Here, J.W. never identified obesity as an impairment, R. 143, 181, and Plaintiff never mentioned obesity as a condition contributing to J.W.'s impairments during the hearing before the ALJ. See R. 32, 37-38, 40. Yet J.W.'s medical records repeatedly referenced her obesity diagnosis. Id. at 237, 245, 246, 248, 270, 299, 341-42, 345, 350, 352-53, 355, 357, 378, 442, 449. Moreover, the record shows that J.W. had made self-deprecating comments about her weight and experienced weight-related teasing. R. 441. Therefore, the record was sufficient to alert the ALJ of J.W.'s obesity.

But "even if we assume - in accordance with common sense - that the administrative record's evidence" of J.W.'s obesity sufficed to alert the ALJ that obesity could be a factor, Plaintiff "has not specified how that factor would affect" the ALJ's three-step analysis. Rutherford, 399 F.3d at 553 (applying same reasoning to ALJ's five-step analysis for an adult claimant). Plaintiff merely asserts that "obesity was an issue that impacted [J.W.'s] mental health in a negative way." Objs. 9. Such a "generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments." Rutherford, 399 F.3d at 553. And, in any event, the ALJ's consideration and adoption of the limitations suggested by doctors who were aware of J.W.'s obesity "constitutes a satisfactory if indirect consideration of that condition." Id. Therefore, because remand for reconsideration of J.W.'s obesity would not affect the outcome, the Court overrules Plaintiff's objection on this basis.

G.    Remand for New Evidence

Lastly, Plaintiff argues that the case should be remanded for consideration of J.W.'s fifth grade IEP, which was completed two months after the ALJ's decision, and which

recommended that J.W. receive special education due to ongoing self-injurious behavior. Objs. 9-10. Judge Rice determined that remand is unnecessary because the ALJ considered similar evidence. R&R 17-18. Plaintiff objects, arguing that the IEP "would have made a difference in the ALJ's analysis because the ALJ found that instances of self-injury decreased in response to treatment." Objs. 9 (citing R. 25). Plaintiff also contends that the IEP contradicts the ALJ's finding that J.W. has difficulty reading at the appropriate grade level "with no evidence of additional significant academic deficits." Id. (citing R. 22). But Plaintiff's arguments are unavailing.

A remand for new evidence is appropriate if (1) the evidence is new, (2) the evidence is material, and (3) there is "good cause" for the claimant's failure to present the evidence to the ALJ. 42 U.S.C. § 405(g). To be "new," evidence cannot be "merely cumulative of what is already in the record." Szubak v. Sec'y of Health & Hum. Servs., 745 F.2d 831, 833 (3d Cir. 1984). Evidence is "material" if there is a "reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Id.

Here, contrary to Plaintiff's objections, the IEP's indication that J.W. struggles in reading and math and would benefit from special education due to ongoing self-injurious behavior does not require remand. First, the IEP's report that

J.W. struggles in reading and math is not "new," because it is cumulative of evidence already in the record. The ALJ found that "the record consistently documents the claimant's difficulty reading." R. 21. The ALJ also noted that Plaintiff "is able to help the claimant with her homework more," and "[a]n adviser has recommended an individualized education program" where "a counselor told [Plaintiff] that the claimant reads at a third grade level." R. 22. The ALJ found that J.W. "seems to show some problems in reading . . . and maybe math." R. 42. Indeed, the ALJ considered a record replete with reports that J.W. had some difficulty in math. See R. 176, 331, 352, 377, 381, 407. But the record also emphasized reading as J.W.'s primary setback. R. 175-76, 393, 396-97, 402, 407, 411, 413. As such, the ALJ concluded that J.W. had "persistent difficulty reading at grade level" but no other significant academic deficits. R. 22. Therefore, the IEP's reiteration of these same difficulties does not require remand.

Second, the IEP's report that J.W. suffered from ongoing self-injurious behavior is not material, because it is consistent with the ALJ's conclusion. The ALJ determined that J.W.'s self-injurious behavior "significantly improved" with treatment; the ALJ did not determine that treatment stopped it entirely. R. 25. The ALJ explained that "although the record demonstrates more frequent reports of self-injury and problems

managing emotions and anger during limited or incomplete outpatient treatment earlier in the relevant period, the claimant's symptoms significantly improved with partial hospitalization as well as consistent therapy," which "suggest[ed] less significant symptoms and limitations with consistent mental health treatment." R. 25. The ALJ recognized that J.W. "continues to experience outbursts that include screaming, saying she wants to die, slapping herself, and kicking walls." Id. But the ALJ concluded that such instances "improved with more consistent mental health treatment and more intense supervision while homeschooled." Id.

The IEP similarly reports that J.W.'s "mood changes and irritability, as well as her negative statements about lack of friends, people not liking her, and just not caring anymore" evidences that she "is experiencing socio-emotional needs that should continue to be addressed through professional counseling services, medication therapy, and hospitalization if and when necessary." R. 217. The need for continued professional counseling services and therapy is consistent with the ALJ's conclusion that J.W.'s self-injurious behavior is appropriately addressed by continued mental health treatment. Therefore, because there is no "reasonable possibility that the new evidence would have changed the outcome," Szubak, 745 F.2d at

833, the IEP is not material and the Court will decline to remand the case for its consideration.

## V.   CONCLUSION

For the foregoing reasons, the Court finds the ALJ's decision to be supported by substantial evidence, overrules Plaintiff's Objections, and adopts the Report and Recommendation, thereby awarding judgment to the Commissioner. An appropriate order follows.